# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT GENE McNEELY, | CV F 02 5385 AWI LJO P |
| Plaintiff, | |
| v. | FINDINGS AND RECOMMENDATIONS REGARDING MOTION FOR SUMMARY JUDGMENT (Doc. 92) |
| PERRY, et. al. | |
| Defendants. | |

Robert Gene McNeely ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action filed pursuant to 42 U.S.C. § 1983.

**A. PROCEDURAL HISTORY**

Plaintiff filed the instant action on April 10, 2002. The Court dismissed the Complaint with leave to amend on May 21, 2002. Plaintiff filed a First Amended Complaint on May 28, 2002. The Court again dismissed the Complaint with leave to amend on June 18, 2002. A Second Amended Complaint was filed on June 26, 2002. The Second Amended Complaint was dismissed with leave to amend on July 17, 2002, and on August 5, 2002, Plaintiff filed a Third

Amended Complaint. Once again, the Court dismissed the Complaint On October 1, 2002, and directed Plaintiff to file a Fourth Amended Complaint or indicate whether he wished to proceed on the claims found cognizable. On October 17, 2002, Plaintiff informed the Court that he wished to proceed on the cognizable Eighth Amendment and ADA claim against Defendants Perry and Cain. The Court issued an Order directing service on these Defendants on December 16, 2002.

On March 10, 2003, Defendants filed a Motion to Dismiss the ADA claim. The Court issued Findings and Recommendations to grant the Motion on August 29, 2003, and further directed Plaintiff to file a Fourth Amended Complaint to clarify the capacity in which he was suing the prison doctors in relation to his ADA claim. During the pendency of the recommendations, Plaintiff filed a Fourth Amended Complaint as recommended by this Court. The District Court adopted the Findings on March 9, 2004.

On October 15, 2004, Plaintiff filed a Fifth Amended Complaint. (Doc. 65.) Defendants filed an Answer to the Fifth Amended Complaint on November 19, 2004.

On December 6, 2006, Defendants filed a Motion for Summary Judgment. Plaintiff filed an Opposition on December 28, 2005. On January 19, 2006, Defendants filed a Reply to Plaintiff's Opposition.[1]

**B. SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a Summary Judgment Motion may properly be

---

[1] Plaintiff filed a Surreply, however, the Court ordered the Surreply stricken from the record. (Doc. 94.)

2

made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (*quoting* Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the Motion for Summary Judgment, the Court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (*citing* United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)(*per curiam*). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (*citation omitted*).

**C. UNDISPUTED FACTS**[2]

1. Plaintiff was incarcerated at Avenal State Prison ("ASP") at all times material to the matters at issue in this action.
2. Defendants W. Cain and M. Perry were Physicians at ASP at the times material to the matters at issue in this Action.
3. In February 1994, McNeely was housed at Deuel Vocational Institute ("DVI"). Dr. Sandri issued a chrono medically unassigning Plaintiff due to his asthma. One month later, Dr. Sainz placed Plaintiff on medically unassigned status due to suspected "Toluene Hypersensitivity" and recommended that McNeely be kept away

---

[2] Plaintiff neither admitted or denied the facts set forth by Defendants as undisputed nor filed a separate Statement of Undisputed facts. Local Rule 56-260(b). Therefore, the Court compiled the statement of undisputed facts from Defendants' Statement of Undisputed Facts and Plaintiff's verified Fifth Amended Complaint and Opposition. Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir. 1998) (verified complaints and oppositions constitute opposing affidavits for purposes of the summary judgment rule if they are based on facts within the pleader's personal knowledge). Because Plaintiff neither submitted his own statement of disputed facts nor addressed Defendants' Statement of Undisputed Facts, the Court accepts Defendants' version of the facts where Plaintiff's verified Fifth Amended Complaint and Opposition are not contradictory. These facts are therefore, undisputed for the purpose of this Motion.

4

|   |   |
|---|---|
| 1 | from paint and paint fumes. |
| 2 | 4. In March 1998, Plaintiff was transferred to the Correctional Training Facility ("CTF") in Soledad, California. In July 1998, Dr. Sinnaco issued chrono noting that due to chronic pulmonary disease McNeely should be limited to lifting, pushing or pulling items under 10 pounds, walking less than two minutes, no running, and no exposure to strong chemicals. In March 1999, Dr. Freiderichs issued a chrono ordering that Plaintiff be housed in a lower bunk due to a medical condition. On March 19, 1999, Dr. Sinnaco, noting Plaintiff's recurrent bronchitis and chronic obstructive pulmonary disease ("COPD"), asked that Plaintiff be medically unassigned. |
| 5. | On October 17, 2001, Nurse Irwin arrived in the emergency room and found Plaintiff in respiratory distress. |
| 6. | On October 17, 2001, Dr. Rosenthal filled out a California Department of Corrections ("CDC") 1845 (Inmate/Parolee Disability Verification) form. Dr. Rosenthal noted that Plaintiff had "severe chronic lung disease which impacts ambulation, cannot walk 100 yards without pausing to breath[e]." After being notified that he was to be transferred from CTF, Plaintiff requested his medical condition be re-evaluated. Plaintiff claimed that, due to change in his medication and environment, his medical condition had significantly improved. |
| 7. | Plaintiff's records show that while he was housed at CTF, Plaintiff was twice transported to an outside hospital for treatment of his breathing difficulties, and he was sent to the infirmary for COPD on numerous occasions. |
| 8. | Plaintiff was transferred to ASP on November 15, 2001. |
| 9. | Upon arriving at ASP, Plaintiff was immediately admitted to the infirmary by Defendant Dr. Cain. Once admitted, Plaintiff was seen by Defendant Dr. Perry, who diagnosed him with COPD exacerbation. |
| 10. | On November 16, 2001, Plaintiff told Defendant Dr. Perry that his illness began in 1994 but a review of the file noted that Plaintiff had received an asthma inhaler in |


1  from paint and paint fumes.

2  4. In March 1998, Plaintiff was transferred to the Correctional Training Facility ("CTF") in Soledad, California. In July 1998, Dr. Sinnaco issued chrono noting that due to chronic pulmonary disease McNeely should be limited to lifting, pushing or pulling items under 10 pounds, walking less than two minutes, no running, and no exposure to strong chemicals. In March 1999, Dr. Freiderichs issued a chrono ordering that Plaintiff be housed in a lower bunk due to a medical condition. On March 19, 1999, Dr. Sinnaco, noting Plaintiff's recurrent bronchitis and chronic obstructive pulmonary disease ("COPD"), asked that Plaintiff be medically unassigned.

5. On October 17, 2001, Nurse Irwin arrived in the emergency room and found Plaintiff in respiratory distress.

6. On October 17, 2001, Dr. Rosenthal filled out a California Department of Corrections ("CDC") 1845 (Inmate/Parolee Disability Verification) form. Dr. Rosenthal noted that Plaintiff had "severe chronic lung disease which impacts ambulation, cannot walk 100 yards without pausing to breath[e]." After being notified that he was to be transferred from CTF, Plaintiff requested his medical condition be re-evaluated. Plaintiff claimed that, due to change in his medication and environment, his medical condition had significantly improved.

7. Plaintiff's records show that while he was housed at CTF, Plaintiff was twice transported to an outside hospital for treatment of his breathing difficulties, and he was sent to the infirmary for COPD on numerous occasions.

8. Plaintiff was transferred to ASP on November 15, 2001.

9. Upon arriving at ASP, Plaintiff was immediately admitted to the infirmary by Defendant Dr. Cain. Once admitted, Plaintiff was seen by Defendant Dr. Perry, who diagnosed him with COPD exacerbation.

10. On November 16, 2001, Plaintiff told Defendant Dr. Perry that his illness began in 1994 but a review of the file noted that Plaintiff had received an asthma inhaler in

1993. Defendant Dr. Perry found Plaintiff's condition most consistent with inhaler abuse and medication non-compliance, and expected Plaintiff's condition to improve with steroids. However, Defendant Dr. Perry believed that Plaintiff's long term stability and ability to function on the yard once released from the hospital was unclear.

11. Defendant Dr. Cain examined Plaintiff on November 17, 2001, and noted Plaintiff's breathing sounds had decreased, and his wheezing had loosened a bit.

12. Two days later Plaintiff was again examined by Defendant Dr. Perry. Defendant Dr. Perry found that Plaintiff had a diffuse wheeze with fair air exchange, but no respiratory distress when Plaintiff was at rest. Defendant Dr. Perry noted that Plaintiff was stable on a high dose of steroids.

13. Defendant Dr. Perry examined Plaintiff again on November 21, 2001. Plaintiff had decreased breathing sounds, little wheeze, and fair air exchange. Defendant Dr. Perry recommended that Plaintiff try to ambulate in the halls of the infirmary to see if he was ready to be placed on the yard. The next day, after walking to the showers, Plaintiff became breathless with very limited respiratory reserve. Defendant Dr. Perry noted the cause as COPD. Defendant Dr. Perry continued to monitor Plaintiff's condition and on November 25, 2001, noted that Plaintiff was not doing well. Defendant Dr. Perry considered Plaintiff's placement on the handicapped yard after his release from the infirmary. Defendant Dr. Cain saw Plaintiff on November 29, 2001, and noted that Plaintiff was stable, and his breathing was saturated at 98%. Several other physicians also treated Plaintiff during his initial placement in the ASP infirmary.

14. On December 3, 2001, Defendant Dr. Perry noted that Plaintiff's condition had improved over the week, his lungs were clear and he had fair air exchange. Defendant Dr. Perry also noted that he would try to move Plaintiff to the infirmary and then to the yard.

15. Plaintiff was discharged from the ASP infirmary on December 6, 2001. Defendant

6

1  Dr. Perry noted that Plaintiff was "obsessing" over possible exposure to smoke.
2  Plaintiff blamed the California Department of Corrections for his condition, even
3  though he had smoked for several years. Plaintiff also blamed smoke and chemical
4  exposure for worsening condition.

16. On December 20, 2001, Defendant Dr. Perry noted that Plaintiff had two "episodes" during the last 12 hours. Defendant Dr. Perry diagnosed severe dyspnea due to the cold temperature and ordered that McNeely be transferred to the emergency room for an internal medicine evaluation by Dr. Pappenfus. Defendant Dr. Perry also noted that "it is unclear that this inmate can function at this institution. He may need transfer to an institution that is warmer or that allows him to remain indoors. Alternative placement on wheelchair yard could be considered." Defendant Dr. Perry drafted a memo to the Chief Medical Officer, Dr. Davis, noting Plaintiff's severe COPD and problems with exposure to cold temperatures. Defendant Dr. Perry asked Dr. Davis to evaluate Plaintiff's need for transfer to a warmer facility or a facility with other accommodations. Dr. Davis observed that Plaintiff would be considered for a transfer if care in the hospital became a frequent necessity.

17. Defendant Dr. Perry issued several medical chronos, noting that Plaintiff needed a lower bunk and lower tier, could not walk more than 100 yards, and needed to be placed on restricted duty.

18. Plaintiff was examined by Dr. Cain on December 27, 2001. Defendant Dr. Cain noted that Plaintiff looked much better than when he arrived at ASP, and that his lungs were now clear. Defendant Dr. Cain wrote an order to refill Plaintiff's medications and ordered that Plaintiff be given a flu vaccine.

19. On February 1, 2002, Plaintiff was seen by Defendant Dr. Perry for a "lung infection." Dr. Perry changed Plaintiff's medications, and a week later, Defendant Dr. Cain noted that Plaintiff felt much better, and that the change in the medication appeared to be working.

20. On March 7, 2002, Defendant Dr. Perry noted that Plaintiff's COPD had recently

7

exacerbated, and that he was unable to get back and forth for medications or chow. Defendant Dr. Perry admitted Plaintiff to the infirmary and again noted that Plaintiff might need to be placed on the wheelchair yard.  The next day Plaintiff complained to Defendant Dr. Perry about his medical treatment.  Plaintiff claimed that he was in the hospital because of his exposure to smoke and chemicals but Defendant Dr. Perry noted that Plaintiff had claimed earlier that he was in the hospital because of his exposure to outside air.

21. Defendant Dr. Cain treated Plaintiff from March 20, 2002, through March 24, 2002, and noted that Plaintiff's lung saturation was at 96-97%, and that he was stable with no complaints other than dry skin.  Defendant Dr. Cain ordered lotion to treat Plaintiff's skin ailment.

22. Plaintiff was examined by Dr. Pappenfus on March 25, 2002.  Dr. Pappenfus noted that Plaintiff was getting along well in the infirmary, but had trouble on the yard getting medications and chow.  With regard to Defendant Dr. Perry's assessment that Plaintiff might need transfer to another institution, Dr. Pappenfus determined that "a transfer to indoor living might make life easier," but was not medically necessary.

23. On April 10, 2002, Plaintiff filed the instant action.

23. Plaintiff continued to be treated by Defendant Drs. Perry and Cain.  On May 17, 2002, Defendant Dr. Perry discussed with Plaintiff the possibility of moving to the wheelchair yard with a personal HHN at his bedside.  Plaintiff was convinced that he would not do well on any yard at ASP, and didn't want to attempt to go to the yard. Defendant Dr. Perry noted that Plaintiff would do better at a facility with ready access to a hospital.

24. On May 30, 2002, Defendant Dr. Perry issued a medical chrono stating that Plaintiff's condition was not expected to improve, and again recommended transfer to another institution where, as far as possible, Plaintiff's housing, meals, and work assignment could be located in the same building, within 100 yards of each other.

25. On July 10, 2002, Plaintiff had trouble breathing and was admitted to the emergency

8

room for evaluation and transfer. Initially, Plaintiff was sent to the Coalinga Regional Medical Center, but was later transported by helicopter to the San Joaquin Community Hospital. Plaintiff was admitted to the outside hospital on July 11, 2002, and discharged on July 13, 2002.

26. Plaintiff was transported back to ASP and placed in the infirmary on July 14, 2002. On August 11, 2002, Plaintiff experienced respiratory failure. Plaintiff was transported via ambulance to the Coalinga Regional Medical Center for treatment and was transferred back to ASP the next day.

27. Defendant Drs. Perry and Cain continued to monitor and treat Plaintiff's condition until he was transferred to California State Prison - Corcoran (CSP-Corcoran), where he was placed in CSP-Corcoran's acute care facility.

28. Since his transfer from ASP, Plaintiff has been housed at several different institutions and treated by several physicians. In October 2002, Dr. Quezada noted that Plaintiff was totally medically disabled, needed to use a wheelchair when off the yard, and issued Plaintiff a low bunk, low tier chrono. These are the same chronos previously issued by Defendant Dr. Perry.

29. On May 12, 2004, Dr. Moor, a physician at California Correctional Institution ("CCI") noted that Plaintiff's medical condition impacted his placement. Dr. Moor also noted that Plaintiff requested transfer to a seaside CDC Facility. Dr. Wyman, the Chief Medical Officer ("CMO") at CCI requested that Plaintiff be transferred to Chuckawalla Valley State Prison ("CVSP"). Plaintiff was transferred on a "medical and return" basis, meaning that upon his discharge from the outpatient housing unit at CVSP, Plaintiff would be transferred back to CCI.

30. On October 14, 2004, Dr. Robinson noted that Plaintiff was seen and evaluated by a pulmonary specialist while at CVSP, and that while Plaintiff's condition was stable at that time, he could not program at that institution. The pulmonary specialist recommended that Plaintiff be transferred to an institution where the air humidity was high, there was no extreme temperature changes, and where he could avoid

second hand smoke and irritants.

31. On May 31, 2005, Plaintiff was accepted for transfer to the California Medical Facility ("CMF") in Vacaville, California.

32. According tot he Inmate/Parolee Disability Verification Form (CDC 1845), Plaintiff has been mobility impaired, impacting his placement since 2001.  The most recent CDC 1845, completed in October 2004, indicates that Plaintiff is mobility impaired and cannot walk 100 yards on a level surface without pause.  Plaintiff requires lower bunk and no stairs in path of travel.  This effectively prohibits Plaintiff's transfer to either CMC, Soledad, or CTF.  Plaintiff could not be properly housed at any of the institutions to which he requested transfer.

33. On December 15, 2003, D. Oftedahl, the CSR at CSP-Corcoran noted on Plaintiff's classification chrono that CTF could not accommodate Plaintiff's medical needs and CTF did not accept inmates with Plaintiff's medical disabilities.

## D. ANALYSIS

### 1. Summary of Complaint

Plaintiff suffers from chronic obstructive pulmonary disease ("COPD") and alleges in his Fifth Amended Complaint that Drs. Perry and Cain were deliberately indifferent to his medical needs because they would not transfer him to a prison that would be more beneficial for his condition.  Specifically, Plaintiff sought to be transferred to CTF or DVI, but preferably CTF.  (Fifth Amended Complaint at unnumbered page 8.)  Plaintiff alleges that the air at ASP was bad, had chemical odors and dust allergens, all which are bad for his COPD condition.  Plaintiff contends that Drs. Perry and Cain knew this and did nothing to have him moved to a facility by the ocean .

Plaintiff states that he cannot attend prison programs, services or activities due to his medical condition.  Plaintiff further states that he cannot walk "100 yards or up a flight of stairs," and would have to go outside and "breathe bad air to get to these services."  Id.  Plaintiff complains that CDC has deprived him of his "only [] chance to breathe clean air [and] but the right to attend activities, etc."  Id.   Plaintiff is seeking monetary damages and injunctive relief.

### 2. *Claims for Relief*

#### a. Eighth Amendment

Where a prisoner's Eighth Amendment claim is one of inadequate medical care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. at 106. Such a claim has two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir.1991). A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.' " McGuckin, 974 F.2d at 1059 (*quoting* Estelle, 429 U.S. at 104). Indications of a serious medical need include "the presence of a medical condition that significantly affects an individual's daily activities." Id. at 1059-60. By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970 (1994).

If a prisoner establishes the existence of a serious medical need, he or she must then show that prison officials responded to the serious medical need with deliberate indifference. Farmer, 511 U.S. at 834. In general, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown by the way in which prison officials provide medical care. Hutchinson v. United States, 838 F.2d 390, 393-94 (9th Cir.1988). Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, however, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir.1980) (*citing* Estelle, 429 U.S. at 105-06). See also Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir.2004). Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" Farmer, 511 U.S. at 835 (*quoting* Whitley, 475 U.S. at 319).

Delays in providing medical care may manifest deliberate indifference. Estelle, 429 U.S.

11

at 104-05.  To establish a claim of deliberate indifference arising from delay, a plaintiff must show that the delay was harmful.  See Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir.1994) (*per curiam*); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir.1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir.1989); Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir.1985) (*per curiam*).

In this case, Defendants assert that Plaintiff fails to state an Eighth Amendment claim for relief.  To the extent that the Fifth Amended Complaint does state a claim for relief, Defendants present ample evidence that Plaintiff's was treated each time he presented for care by both Defendant Drs. Perry and Cain and thus, was not denied his Eighth Amendment rights.

Plaintiff's chief complaint is that Defendants were deliberately indifferent because although they knew his placement at a different facility might be beneficial for his medical condition, they did not ensure that he was, in fact, transferred.  However, Defendants provide evidence that on two occasions, Defendant Perry recommended that Plaintiff be transferred to another institution, once writing a memo to the Chief Medical Officer, Dr. Davis.  However, the transfer recommendation was denied as medically unnecessary.  The evidence provided also shows that Plaintiff could not be properly cared for at either CTF or CMC, the institutions where he wished to be housed.

The Court finds that Defendants have met their initial burden of informing the Court of the basis for their Motion, and identifying those portions of the record which they believe demonstrate the absence of a genuine issue of material fact.  The burden therefore shifts to Plaintiff to establish that a genuine issue as to any material fact actually does exist.  See  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

As stated above, in attempting to establish the existence of this factual dispute, Plaintiff may not rely upon the mere allegations or denials of his pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank v. Cities Service. Co., 391 U.S. 253, 289 (1968); Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).

In Opposition, Plaintiff argues that Defendant Perry informed him that he had no control over where Plaintiff was housed but that this is a "lie." Plaintiff provides no evidence, however, that Defendants Perry or Cain had any authority over where Plaintiff was incarcerated. As noted above, Defendant Dr. Perry recommended Plaintiff's transfer on two occasions, however, it was denied by the Chief Medical Officer as medically unnecessary. Even assuming the truth of Plaintiff's allegations, prison inmates do not have a constitutional right to be incarcerated at a particular correctional facility or to be transferred from one facility to another. Meachum v. Fano, 427 U.S. 215, 224-25 (1976).

Moreover, Plaintiff's contention that he medically requires transfer to a particular institution of his choice despite the Chief Medical Officer's denial of his request, constitutes a disagreement in treatment or diagnosis.[3] Mere differences of opinion between a prisoner and prison medical staff as to proper medical care, however, do not give rise to a § 1983 claim. See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir.1989); Franklin v. Oregon, 662 F.2d 1337, 1334 (9th Cir.1981).

As noted above, other than the conclusory statement that Defendant's had control over Plaintiff's placement, Plaintiff presents no evidence to support his allegation nor does he provide any evidence to show that Defendants knew of and disregarded a serious medical need in violation of the Eighth Amendment. Accordingly, Defendants are entitled to summary judgment on the Eighth Amendment claim.

### b. ADA/RA claims

Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act ("RA") "both prohibit discrimination on the basis of disability." Lovell v. Chandler, 303 F.3d 1039, 1052 (9th Cir. 2002). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by such entity." 42 U.S.C. § 12132. Section 504 of the RA provides that "no otherwise qualified

---

[3] Dr. Davis, Chief Medical Officer is not a party to the case as he was not named in the Fifth Amended Complaint.

13

individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U. S. C. § 794.  Title II of the ADA and the RA apply to inmates within state prisons. Pennsylvania Dept. of Corrections v. Yeskey, 118 S.Ct. 1952, 1955 (1998); see also Armstrong v. Wilson, 124 F.3d 1019, 1023 (9th Cir. 1997); Duffy v. Riveland, 98 F.3d 447, 453-56 (9th Cir. 1996).

"To establish a violation of Title II of the ADA, a plaintiff must show that (1) [he] is a qualified individual with a disability; (2) [he] was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities; and (3) such exclusion or discrimination was by reason of [his] disability." Lovell, 303 F.3d at 1052. "To establish a violation of § 504 of the RA, a plaintiff must show that (1) [he] is handicapped within the meaning of the RA; (2) [he] is otherwise qualified for the benefit or services sought; (3) [he] was denied the benefit or services solely by reason of [his] handicap; and (4) the program providing the benefit or services receives federal financial assistance." Id.

Defendants argue that Plaintiff has presented no evidence that Defendants denied medical treatment or was discriminated on the basis of his disability.  Further, the undisputed facts and evidence show that Defendant's made extensive efforts to accommodate Plaintiff's disability by providing him with all the requisite medical services, including chronos for a lower bunk, a wheelchair, and work accommodations in addition to the recommendation that Plaintiff be transferred.  Thus, Defendants contend, there is no disputed fact as to Plaintiff's ADA/RA claim.

The Court finds that Defendants have met their initial burden of informing the Court of the basis for their Motion, and identifying those portions of the record which they believe demonstrate the absence of a genuine issue of material fact.  The burden therefore shifts to Plaintiff to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

As stated above, in attempting to establish the existence of this factual dispute, Plaintiff may not rely upon the mere allegations or denials of his pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in

support of its contention that the dispute exists. Rule 56(e); <u>Matsushita</u>, 475 U.S. at 586 n.11; <u>First Nat'l Bank v. Cities Service. Co.</u>, 391 U.S. 253, 289 (1968); <u>Strong v. France</u>, 474 F.2d 747, 749 (9th Cir. 1973).

Here, again, Plaintiff does not provide evidence demonstrating that there exists a disputed issue of fact with respect to his ADA/RA claim for relief. In fact, after reviewing the Fifth Amended Complaint it is questionable that Plaintiff states a cognizable claim for relief under the ADA.

First, assuming that Plaintiff is a "qualified individual" under the ADA, he states, in the Fifth Amended Complaint, that his medical condition prevents him from walking "100 yards or up a flight of stairs, [and thus, he] *cannot attend* programs, services, or activities" because to do so would require him to go outside and breathe "bad air." (Fifth Amended Complaint at unnumbered pg. 8.) (Emphasis added). Plaintiff does not state with any specificity which programs, activities, or services are being denied him, that such services are federally funded, that the programs and services were in fact denied to him based on his disability, or that he requested accommodation and that such request was denied. See, <u>Carrasquillo v. City of New York</u>, 324 F.Supp.2d 428 (S.D.N.Y. 2004) (allegations that prisoner placed in housing far from law library and infirmary was forced to walk while in pain from condition did not support claim under the ADA, absent allegation that he was prevented from participating or benefitting from programs due to his disability.) On the contrary, the Fifth Amended Complaint states that Plaintiff could not attend various programs, activities or services because of his medical condition and not because of any specific act or omission by the Defendants.

Even were the Court to find that the Fifth Amended Complaint stated a cognizable claim for relief under the ADA/RA, Plaintiff has failed to meet his burden in summary judgment. As noted above, Plaintiff fails to provide evidence of the specific programs denied him or that such a denial was on the basis of his disability and such services were refused by the Defendants named in this action.

Finally, Plaintiff is precluded from holding Defendants liable in their individual and official capacities. The ADA defines "public entity" in relevant part as "any State or local

government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A)-(B). "Title II of the ADA prohibits discrimination in programs of a public entity or discrimination by any such entity." Roundtree v. Adams, 2005 WL 3284405 (E.D. Cal. 2005), *citing* Thomas v. Nakatani, 128 F.Supp.2d 684, 691 (D. Haw. 2000). The term "public entity," "as it is defined within the statute, does not include individuals." Alsbrook v. City of Maumelle, 184 F.3d 999, 1005 n.8 (8th Cir. 1999); see also 42 U.S.C. § 12131(1). "In suits under Title II of the ADA . . . the proper defendant usually is an organization rather than a natural person. . . . Thus, as a rule, there is no personal liability under Title II." Walker v. Snyder, 213 F.3d 344, 346 (7th Cir. 2000); *accord* Miller v. King, 384 F.3d 1248, 1276-77 (11th Cir. 2004); Alsbrook v. City of Maumelle, 184 F.3d 999, 1005 n. 8 (8th Cir. 1999); Montez v. Romer, 32 F.Supp.2d 1235, 1240-41 (D. Colo. 1999) (finding that individual liability does not exist under the ADA); Butler v. City of Prarie Village, 172 F.3d 736, 744 (10th Cir. 1999); Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir. 1996); Gallo v. Bd of Regents of the University of California, 916 F.Supp. 1005, 1009 (S.D. Cal. 1995.)

Accordingly, for the reasons stated above, Plaintiff's ADA claim for relief against Defendants, all of whom are individuals, is not cognizable and the Defendants are entitled to summary judgment.

### c. Qualified Immunity

Based on the above, the Court declines to address Defendant's claim of qualified immunity.

### E. CONCLUSION AND RECOMMENDATION

The Court HEREBY RECOMMENDS that Defendant's Motion for Summary Judgment be GRANTED, the action DISMISSED, and JUDGMENT be entered in favor of Defendants.

The Court further ORDERS that these Findings and Recommendations be submitted to the United States District Court Judge assigned to this action pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within THIRTY (30) days after being served with a copy of these Findings and Recommendations, any party may file written Objections with the

1  Court and serve a copy on all parties.  Such a document should be captioned "Objections to
2  Magistrate Judge's Findings and Recommendations."  Replies to the Objections shall be served
3  and filed within TEN (10) court days (plus three days if served by mail) after service of the
4  Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C.
5  § 636 (b)(1)(C). The parties are advised that failure to file Objections within the specified time
6  may waive the right to appeal the Order of the District Court.  Martinez v. Ylst, 951 F.2d 1153
7  (9th Cir. 1991).

8  IT IS SO ORDERED.

9  **Dated:   May 3, 2006**                              /s/ Lawrence J. O'Neill
   b9ed48                                           UNITED STATES MAGISTRATE JUDGE